The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Morning, everyone. We have four arguments on the calendar for this morning. Before we begin, though, I do want to make sure that Judge Motz can hear us all. Yes, sir. Wonderful. All right. So my understanding is that the first case we have is number 231313 Universal Life Insurance Company v. Greg Lindberg. Mr. Whitehill, I understand you're first. Yes, Your Honor. You can proceed whenever you're ready. Your Honors, may it please the Court, Bill Whitehill for Greg Lindberg. This is a breach of contract case, and like all breach of contract cases, turns on the specific language of the contracts before the parties. Regardless of who the parties are, regardless of the amount in controversy, it is going to be decided by the plain text of the documents and the application of universal breach of contract principles of law. To establish summary judgment, ULICO had to prove three things. The existence of a debt, two, within the scope of the guarantee, and three, resulting injury and damages. OK. I want to, the existence of a debt is a pure legal question that depends upon the application of established res judicata privity principles to the facts of this case. The contract construction, the scope argument is a pure question of the terms of the contract and applying contract principles there. And the third question, injury and damages is a legal issue based upon the particular unusual facts of this case with the trust and the guarantee out there. I want to start with the contract construction issue because it's just a contract construction issue. The issue turns upon the difference between a performance guarantee and a payment guarantee. In this case, it's a payment guarantee and the terms of the guarantee agreement and the reinsurance agreement. Now, it's interesting because Magistrate Judge Peek was had to write down the correct path all till the very end because she recognized that this is a payment guarantee. She recognized that the reinsurance agreement imposes two separate types of obligations on PBLA. One is the duty to pay its 75 percent share of the insurance liabilities. And the other is to deposit collateral in a trust account to be held to be used in case the payment obligations are not met, are not met. Where she got it wrong is at the very end, she said the guarantee covers all obligations under the RIA, and it just simply doesn't say that it would have been easy for the party to say is a guarantee of all obligations under the RIA, but it just doesn't say that. It limits it to the payment obligations. What are PBLA's payment obligations under the RIA or the reinsurance agreement? Those are set out in Article 3. The way the RIA is structured, there are three main particles, 2, 3, and 4. Article 2 lays out an outline of the basic structure of the agreement. We're going to pay insurance liabilities. We're going to create a trust. Article 3 talks about the seating of the insurance, the liability, insurance liabilities that are going to be paid. And Article 4 talks about funding and depositing collateral into these separate trusts to secure the payment. An important feature here is that providing collateral to secure a payment is just not the same thing as paying the obligation itself. Those are two separate things. Do you agree the arbitration award actually ordered PBLA to pay money to the plaintiff? Yes, it does. And what's interesting about that, Your Honor, is Magistrate Peek characterized that award as an award of specific performance. And if it's an award of specific performance, and it is because when you read the arbitration award, all it talks about is depositing money, if you will, in a segregated account that's going to be controlled by the arbitrators somehow. They're creating a surrogate trust, which is a surrogate substitute for Article 4 of the reinsurance agreement. So I guess what I'm saying is my understanding is the obligation under the contractual arrangement was basically they keep the money. They just have to put the money in a segregated account, but they keep the money. That was the sort of original deal? Well, the original – no. The original deal under the reinsurance agreement and the trust agreement is there is a separate trustee. Wilmington Trust is going to be the original trustee to hold the money and the assets, the collateral. The arbitration agreement, though, requires PBLA to cut a check to somebody. Yes, Your Honor. That's correct. And do you agree that that check has not been – I understand you argue that it's been cut kind of and some of the money, but is there any dispute that the entirety of the check has never been cut? There is no dispute over that fact, Your Honor. Okay. Now, the guarantee doesn't mention arbitration awards. So as a matter of plain text, the starting point is the guarantee doesn't cover arbitration awards unless it is a surrogate for something that the RA does cover – apply to. Okay. So what does the arbitration award represent? Does it represent the payment of an insurance liability or does it represent the deposit of collateral, a separate obligation? That seems like an important, though, conceptual concession you just made, and let me just walk through why. So imagine the parties disagreed about whether a certain payment obligation existed, right? Right. One side said it did. One side said it didn't. They then arbitrated. Correct. And the arbitrator said you actually have to pay them X dollars, right? Now, at this point, a really literous – you agree with me that at that point your client couldn't say, well, I know the arbitrator said that, but complying with an arbitration award isn't complying with the contract. And then the response is the arbitrator just told you what the contract meant, so, yes, it is complying with the contract. Do you agree with that? I believe so. And just because – just because you went to arbitration to enforce an obligation under the contract doesn't mean that the order to comply with the arbitration agreement isn't a payment due under the contract, right? That's correct. The fact that this went to arbitration doesn't define the nature of the obligation one way or the other. It could have been a suit in district court for all those purposes. What defines the nature of the obligation is what is being told to be done. What does it represent? In this case, the award represents specific performance. Now, specific performance can only exist for the performance of an obligation. It doesn't exist to remedy damages, right? So when Magistrate Peek said this is for specific performance, she's saying that the award represents an obligation to deposit collateral to secure the payment of this debt. And that's all the arbitration award talks about is, okay, there's a perceived problem of the collateral. We're going to remedy that perceived problem by creating really a second trust agreement. Yes, the money is going to be deposited in an account in ULICO's name, but it's going to be controlled by the arbitrators. And I submit that's apparently unusual. Arbitrators usually don't do that kind of thing. Well, look, maybe that's an argument. Can I just ask you, there's sort of a flavor of your argument that this arbitration decision is just wrong in the sense that the arbitrators did something they weren't authorized to do, they shouldn't have done, et cetera, et cetera, et cetera. But, you know, there is a procedure for appealing arbitration awards or seeking to law and code. This is not that, right? So, I mean, don't we just have to take as a given that whatever the arbitrators did was something the arbitrators were allowed to do? Yes, Your Honor, we're not challenging that in this case. They just did say it's sort of a weird thing they did, which kind of sounds like saying they shouldn't have done the thing they did. Well, I apologize if that's what was understood. That's not what we're saying. That is what would have happened in the Second Circuit had Mr. Lindbergh not been booted out of the company and lost control of PBLA before it ever had an opportunity to file a brief in that case. And that leads to the privity issue, right? There are only three ways that one can prove the debt against the guarantor. One, sue the guarantor and the primary debtor in the same case. Great. The evidence comes in against both of them at the same time. Two, sue the guarantor in a separate case and rely on res judicata. That guarantor is bound by the first judgment, by privity principles. Or three, prove it up in a third case. And that happens all the time. But prove what up in the third case? The existence of a debt. And why isn't the arbitration agreement conclusive evidence of the existence of a debt? It would be had the guarantee said Mr. Lindbergh guarantees payment of arbitration awards. Or if the guarantee had said Mr. Lindbergh guarantees payment of judgments, that happens in surety cases all the time. If this were a surety case or the agreement said guarantees payment of arbitration awards, that would end it on that issue, right? But that's not what the agreement says. The agreement says payment of obligations of is a preposition that ties payment to obligations. So the RIA Section 2.1a, which defines the scope, is purely a payment obligation. So we have to. And I consider your argument and look. But it clearly says payment of obligations, not payment obligations. Where are you getting that in the agreement it says payment obligations? Well, just that phrase, Your Honor, focused on payment of obligations. It could have said payment and performance of obligations, but it doesn't. It says payment of obligations. So what are the payment obligations? In that context, like I said, of is a preposition that ties the word payment to obligations. So all that we're talking about in 2.1a is payment obligations. What are the obligations under the RIA to pay money to ULICO? The only obligations to pay money to ULICO are under the Article 3 insurance liability requirements. That's that. Because the award is a surrogate, surrogate, RIA created performance duty. And the guarantee doesn't cover performance duties. It only covers payment of obligations, not performance of obligations. It is not covered by the guarantee. Now, the existence of the debt, we talked about residue to counterprinciples. This whole argument that Judge Benjamin was just raising, can I ask you about Clause 2.1c? Right. Which does seem to refer to obligations being satisfied by PBLA's performance, as in it says that your client can raise as a defense that PBLA performed. How is that consistent with this idea that this contract draws this radical distinction between payment and performance? Well, they could have done some other way to pay the obligations. But what your court has focused on is possibly, and I'm not suggesting it's ambiguous, but it's possibly ambiguous. You're saying this contract draws this radical distinction between payment and performance. And then it says when your client is sued or accused of not meeting his, what you call payment obligations, he can defend the ground that they performed, which doesn't that just obliterate this whole distinction that you're trying to draw? It doesn't because 2.1c, 2.1a defines the scope. In fact, the defined term— I guess let me give you, under your view of the contract, what operation would that provision ever have? Like what's the scenario where your client would otherwise be on the hook for something, but now he's not on the hook for something because he can show they performed? In your view of the contract, what work does that provision do? Let's say that he had—that they had agreed on a separate promissory note or they agreed to accept something else in form of payment. They had swapped this for that. But Section 2.1a, the term guaranteed obligations says look at 2.1a. So that's where we look to find the guaranteed obligation. 2.1b says this is how you're going to do things. But 2.1c talks about payment or performance, which sort of suggests that the contract, the guarantee contemplates payment and performance obligations. Well, this is in the response. We're talking about the RIA, and the RIA has two types of obligations, the payment obligation and the performance obligation. Well, aren't there several provisions in the guarantee that refer to payment or performance? Pardon? Aren't there several provisions in the guarantee that talk about payment or performance? Why don't we just assume for the moment that there are and then explain to me why that doesn't indicate—why that isn't contrary to your argument? I can see that the words are there. Okay. Hard to argue that. I'm sorry. If there is confusion created here, then it's ambiguous and it would be a fact question, and the result would be reverse and remanded back to the trial court. I've used up my 15 minutes, and so I will sit down. Happy to answer any further questions the court has. Of course. Mr. Browning, we'll hear from you. May it please the court? Lindbergh's arguments fail for three primary reasons. First, the plain language of the agreement. This is an arbitration award to pay $524 million, an obligation that no one can contest, that PBLA clearly owes, and under the plain language, the unambiguous language of Lindbergh's guarantee, that falls within the scope of what he is obligated to do under his guarantee. Second, res judicata is simply an alternative basis to affirm the district court's decision, and all of the elements of res judicata have been met. And third, even though Mr. Whitehill did not get to this, he spends a tremendous amount of time in his brief talking about how there was a payment that occurred as a result of a single line entry in ULICO's 2020 annual report. I would like to also walk through and give the court a comfort level as to why that is not payment and doesn't raise a genuine issue of material fact. Before you jump into that, can I just ask you two quick questions about the arbitration award that are just rattling around in my head? Absolutely. So the first one is that the record of this case says the award is preliminary or something to that nature. Can you just walk me through what that is and tell me what the status of the award is? It refers to it as being preliminary in that if this doesn't resolve things, the arbitration panel is reserving jurisdiction. But there was a hearing on the merits. The court concluded that the evidence showed that the assets in this trust did not satisfy the contractual obligations, and the panel's decision refers to it being they're not liquid assets that policyholders can rely upon, and it therefore violates the investment guidelines and the Puerto Rico insurance code. So it's not preliminary in the sense of like a court issuing a preliminary injunction says, well, as of right now, I think the plaintiff probably wins, but this isn't my final decision, and I'm going to come back later and tell you my real final. It's not that kind of preliminary. No, it is not. I would look at it as a partial award by an arbitration panel, which is permitted under the – recognized expertly under the Federal Arbitration Act. It is a determination that there is an obligation to pay. That obligation to pay is now. If this doesn't resolve things, the panel will take up issues down the road. So second question, I'm trying to figure out what this arbitration award actually requires them to do in the sense of – does it require them to cut a check to universal? Like what happens to this money? What does, in your view, the respondent in this arbitration proceeding – what would they do that would satisfy this award? It gets paid $524 million into a segregated account. That is held by whom? It is to be set up. This is the part that was confusing to me, like a segregated account, but like someone owns this account. Who owns this account? Basically think of another trust account, bank account, since it would be cash being set up, and there is an obligation under the arbitration award that that money only be used for obligations under the reinsurance agreement. Now the argument – I'll just ask this, and then I promise I'll drop this. Who is the legal owner of the account this money goes into? The legal owner would be in the title of Universal Life Insurance Company, ULICO, but it has that restriction. Now the only reason the panel set it up this way is PBLA, under the direct control of Greg Lindbergh, had taken hundreds of millions of dollars in liquid assets – So at this point, PBLA could not be trusted to do anything, and that's reflected by the fact that it went into liquidation. So this is an alternative approach. Put the money somewhere where it can be monitored, where it is set aside for purposes of these obligations. It is one and the same as the trust account, but PBLA could no longer be trusted. And that's the only reason the arbitration panel did it this way, is these protections were necessary, but it's effectively the equivalent of the trust assets. They're just being parked somewhere that's safe for the time being. Now let me focus on the specific language, the plain language of the statute here, or the plain language of the contractual agreements. The guarantee agreement, of course, is governed by North Carolina law, and as the panel has recognized, 2.1a is the most direct language, but there's also language throughout the guarantee that makes clear what the party's intent would be and the purpose of this trust. 2.1a provides that Lindbergh hereby guarantees PBLA's full and prompt payment when due of PBLA's obligations under the reinsurance agreement. Judge Hytens, as you recognized, a dispute arose when money was taken from this trust. It was diverted to IOUs from the trust to Greg Lindbergh, and those were no longer liquid assets. They were no longer conforming assets. The arbitration panel resolved that dispute, and it concluded that $524 million was to be put in a segregated account to be used to pay PBLA's obligations under the reinsurance agreement, and that arbitration award clearly says pay $524 million. PBLA failed to do so. Demand was made on Lindbergh, and he also failed to do so, and not only is the arbitration award that determination firmly based on the plain language of the agreement, but it also is supported by the purpose of this agreement. Greg Lindbergh formed PBLA, a Bermuda entity, for the sole purpose of serving as Ulico's reinsurer. We were their only client. At the time they were created and throughout its existence, PBLA had no insurance rating. So prior to handing over $500 million of policyholder premiums so that there would be security to ensure that PBLA did exactly what it was required to do, prior to turning over that money, Ulico insisted on a broad guarantee. Not only does it require PBLA to provide, to fulfill its obligations, but as the court has recognized throughout, it has language such as absolute without any other conditions. But Judge Heiden's and Judge Mott's, your reference to 2.1C, there is also language in there that is dispositive of this obligation. Well, I was going to ask about that. He makes this argument on this motion to vacate that Mr. Lindbergh was not privy to when the motion to vacate was withdrawn. What's your position on this argument or issue, I guess? Your Honor, it doesn't matter for two reasons. First of all, our principal argument is that the arbitration award is an obligation that has to be paid by Greg Lindbergh under the plain language. But as an alternative to affirming the district court, the res judicata precludes him from challenging any aspect of the arbitration award. And he says throughout his brief repeatedly that Ulico relies exclusively on res judicata. But I'd cite the court to our reply brief in support of summary judgment where we say the issue of res judicata is a separate and independent reason for rejecting Lindbergh's argument. In the joint appendix at 1241, the same is true of our summary judgment motion in the record at 1080. And our response to the joint appendix to the magistrate judge's recommended decision at joint appendix page 1305 to 1306. And also in our response to his Rule 59 motion at page 1452. For given the clear record, it is very surprising that on appeal now Lindbergh says that throughout our briefs we have said it's res judicata or nothing. We've never said that, and that is not the case. Now, res judicata, as I said, all of the elements have been met here. Under North Carolina law, a court must extend res judicata effect to an arbitration award, whether it is confirmed or unconfirmed. And in Murakami v. Wilmington Star News, a North Carolina court of appeals decision from 2000, there the court recognized that an arbitration award gives rise to res judicata effect even if there is no appeal, particularly if the parties intended that there would be no appeal. Is this argument your chief argument, this res judicata argument? No, Your Honor, it's not. Our argument, our principal argument is that under the plain language, Lindbergh steps into the shoes of the debtor and with respect to liability. That is supported by North Carolina case law, but it's also the plain language. Pay any obligation, and this is an obligation. So, Judge Motz, this is truly an alternative argument, but one that has been made and is preserved despite what Lindbergh is now saying in his briefs. And Judge Benjamin, continuing on with your question as to why does the fact that he wasn't at the helm at the time that the Second Circuit decision was abandoned by PBLA, the rule is that there has to be a full and fair opportunity to litigate in the arbitration proceeding. Now, given North Carolina law, given the fact that you recognize res judicata for a judgment, whether it's confirmed or unconfirmed, that really shouldn't matter how far it goes in the appeal. And given the fact that the language in our arbitration agreement is identical to that in Murakami v. Wilmington Star News, res judicata clearly applies under North Carolina law, but it also applies under New York law if you want to analyze it there. And that's also set out in our brief, and I would cite the court to our brief at page 19 through 20, our discussion of I-Appel v. Katz. There, the Southern District of New York, the federal court, goes through and analyzes a string of New York state appellate decisions, and it comes to the conclusion, in light of the strong public policy considerations in favor of resolving disputes by arbitration, the party's ability to apply for vacatur of an award should satisfy any right to appeal component contained in the full and fair opportunity to litigate aspect of res judicata. Here, there was a full and fair opportunity to litigate. Lindbergh concedes that he was in privity with PBLA. He concedes that he controlled PBLA. And the fact that he put into liquidation and that the Bermuda Supreme Court appointed liquidators to take over PBLA to make sure that its assets were preserved or what assets remained were preserved, at that point, they concluded that there was no legitimate basis to proceed with the Second Circuit appeal. It would be throwing good money after bad and thus inconsistent with their duties to protect the remaining assets. Absolutely, Your Honor. And unfortunately, with dealing with Mr. Lindbergh, we have seen a lot of throwing good money after bad, money that came from my client's trust account. Now, there is one aspect that I want to emphasize with regard to the plain language of the statute, and that is Section 2.1c, where the guarantee states that ULICO may recover the full amount of PBLA's liability and otherwise enforce its rights under the guarantee. That also emphasizes that this purported difference between a payment and performance obligation is meaningless. It is simply smoke and mirrors here. Now, the other aspect of the plain language that I want to point out is that Lindbergh goes through a five-step argument as to why an obligation to pay $524 million is not covered by his guarantee. But his argument requires altering the plain language of the guarantee by adding words such as covered item and surrogate for PBLA's obligation. All five steps in his argument at page 17 of his brief is flawed. But the linchpin of that argument is at page 28, where he writes, The parties did not contemplate PBLA ever paying collateral to ULICO. Debtors don't pay collateral. They pledge, deliver, provide, tender, or deposit collateral. But paying collateral is not a normal word usage. Well, if it's not a normal word usage, Lindbergh and his attorneys certainly used it repeatedly in the district court before they developed this argument on appeal. And I would cite the court to the joint appendix at page 1099, where he writes in his brief to the district court, PBLA's only relevant payment obligation under the reinsurance agreement is its duty to deposit additional assets to the trust as necessary to achieve a value of 105% of statutory reserves. Lindbergh has conceded away at the district court the very argument he is trying to make now for the first time on appeal. We also cite in our brief at page 24, Bressler v. Wilmington Trust, where this court used the term payment of collateral, collateral payments, and to pay collateral 17 times. At the same page of our brief, we cite numerous other courts throughout the country doing the exact same thing. Lindbergh attempts to distinguish these cases by going to the record and saying, well, the Fourth Circuit said payment of the collateral, but if you look at the actual agreement, it said post-collateral. That proves our very point. Payment of collateral is a normal usage of the words in the English language to refer to depositing, posting, pledging, providing collateral. Now, very briefly, I'd like to point to another aspect of his brief that merits the remaining one minute of my time. Lindbergh refers to ULICO's annual statement as constituting payment of this arbitration award, even though his counsel admits that no check was ever written to pay this $524 million. And as noted in our brief, there was a partial payment of $25 million by Lindbergh a year and a half ago. But the award says pay $524 million within 10 business days. It doesn't say pay $524 million less whatever amount is listed in your annual statement as reserve credit. The annual statement does not show that the arbitration award has been paid, but it does show, and he quotes this in his brief, that regulatory bodies in Puerto Rico and Bermuda have been kept in the loop with regard to what was happening with regard to the trust. And as a result, they were allowed credit on a temporary basis. There has been no payment as a result of this annual statement. For the reasons set out in our brief, we would ask that the decision of the district court be affirmed. Thank you. Thank you, Mr. Browning. Mr. Whitehill, you have some rebuttal time. Thank you, Your Honors. I want to start with the privity question first. And specifically, I want to start with a case that I came across just the other day. So sadly, it's not in our briefs. It had been. But it's a dispositive case on the privity issue, I believe. And it is first recovery versus unlimited rec rep. It's 884 72nd 172 out of North Carolina Appellate Court. It's a 2023 decision. And what happened in that case is that the appellate it's a guarantee type situation. There's a judgment in a first case. It's a bankruptcy order in a first case and a guarantee over here. What happened is right up until the time before the second court entered its judgment, the bankruptcy court order got vacated. So we no longer had any res judicata effect. What that meant for the second case is, OK, we can't rely on res judicata anymore. That goes away. What else do you got? They don't have anything else. That's where we are in this case is there was an opportunity afforded to Mr. Lindberg under full and fair opportunity to have the award in ensuing judgment vacated. And that was taken away from him. That opportunity was blown up when the JPL is the joint provisional liquidators came in and. And voluntarily removed Mr. Lindberg from his position of privity, took over and dismissed the second circuit appeal before there was ever an opportunity to file a brief. So we don't know how that was going to turn out. But the point is. But when a two point one see this, this language regarding appeal, even if he were to one point, one C is the waiver is pretty broad. Right. Well, two point one. And I apologize. Earlier I referred to it as being in the it is in the guarantee. So I want to correct that. It says what it says. I can't argue with that. Two point one C deals with a lot of things other than the scope. Its purpose in there is mostly to waive defenses that would otherwise apply to a guarantor. And those can be notice of dishonor. Those could be alteration of debt. There are many, many defenses that traditionally belong to guarantors. Modern loan agreements remove all those. And that's what it does. That is the point of this. The record doesn't reflect why it says performance of in full of guaranteed obligations other than. It is what it is. I submit that a this section shouldn't be considered because it doesn't deal with the scope. If it is considered at all, it creates an ambiguity because it's inconsistent with two point one a. Now, my colleague said, represented to the court, that it was Mr. Lindbergh that put PBL into liquidation. That's not in the record. That's just not in the record. He talked about a sentence, poorly chosen sentence. And you chose response to the summary judgment. It says what it says. But I would invite the court to read the entire response to the summary judgment where it's clear that what Mr. Lindbergh was talking about was the two separate obligations. And he separated them and talked about them. Magistrate Judge Peak was not confused. She didn't rely on that sentence to prove anything. You didn't argue that sentence in the district court in this case is having anything. So that's not. My colleague again said the guarantee require them to pay any obligation. That's just not the language of the guarantee. It could have been the language of the guarantee, but it's not focus. I urge the court needs to be on 2.1a, which is what the party said. This is the scope. I want to talk briefly about the damages. You have two separate things here. You have a trust that has assets in it, and then you have an award to pay money. They had to prove damages as a result of the alleged breach. But what would that measure be? It would be the delta between the 524 and the value that's in the trust, because the law requires the injury to be a direct result, approximate result of the breach. In this case, there has to be some indication of that. Otherwise, you have a double recovery. That's not permitted. I appreciate the court's time. Stand for any questions. We ask Mr. Lindbergh asked the court to reverse and render or reverse and remand. Thank you very much. Do you have any questions? I don't. Thank you. Thank you very much. We'll come down and greet counsel and proceed directly into our second case.
judges: Toby J. Heytens, DeAndrea Gist Benjamin, Diana Gribbon Motz